UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLEN VETROMILE,

                              Plaintiff,

          -v-                                              07-CV-11032 (KMK)


                                                           OPINION AND ORDER
JPI PARTNERS, LLC,

                              Defendant.


Appearances:

Paul T. Shoemaker, Esq.
Greenfield, Stein & Senior, L.L.P.
New York, NY
*Counsel for Plaintiff*

Neil G. Sparber, Esq.
Fulbright & Jaworski, L.L.P.
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff, Glen Vetromile ("Plaintiff" or "Vetromile"), brings this action against JPI

Partners, LLC ("JPI" or "Defendant"), his former employer, asserting breach of contract,

quantum meruit, and unjust enrichment claims for the alleged failure of JPI to pay certain

compensation and severance.  Before the Court are the Parties' cross-motions for summary

judgment.  For the reasons stated herein, Defendant's Motion for Summary Judgment is granted

in part and denied in part, and Plaintiff's Cross-Motion for Summary Judgment is denied.

## I. Background

### A. Factual Background

        Plaintiff was employed by Defendant as the "senior vice president and New York area

partner" from on or about June 26, 2006 until on or about November 13, 2006, when he was

terminated.  (Def.'s Statement of Undisputed Facts Pursuant to Local R. 56.1 ("Def.'s 56.1

Stmt.") ¶¶ 22, 27.)[1]  Plaintiff was an at-will employee of Defendant.  (*Id.* ¶ 23.)  Plaintiff's

termination was not for cause, but due to "cultural differences."  (Aff. of Neil Sparber ("Sparber

Aff.") Ex. F, at 88.)

1. Contractual Provisions and Plaintiff's Claims

Plaintiff asserts that he is entitled to three separate bonuses, participation in a profit

sharing program, and severance benefits.  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for

Summ. J. & in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Mem.") 6-11.)  These claims are

grounded primarily in the contract signed by the Parties on June 16, 2006, which was entitled

"Area Development Partners Profit Participation Plan" (the "Contract").  (Aff. of Jim Butz

("Butz Aff.") ¶ 3; *id.* Ex. A, at J52.)  The Contract included provisions generally applicable to

employees of Defendant at Plaintiff's level, and the accompanying "Addendum to Partners Profit

Participation Plan" (the "Addendum"), which contained provisions specific to Plaintiff.  (*Id.* at

J68.)

a. The Bonuses

The Contract and Addendum provide for multiple bonuses for Plaintiff.  The first bonus

is a $100,000 employment bonus dictated by the following provision in the Addendum: "For the

first three years of employment a minimum of $100,000.00 bonus will be paid as approved by

the [Defendant] and the [Plaintiff] must be employed by the Company.  The above stated bonus

is not a draw and will not be netted with future Profit Participation payments."  (*Id.*)

---

[1]Unless otherwise noted, citations to Defendant's 56.1 Statement are citations to facts
undisputed by Plaintiff's Statement Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Stmt.").  (*See* Pl.'s
56.1 Stmt. 1 (admitting, by omission, the facts contained in Def.'s 56.1 Stmt. ¶¶ 1-37).)

The remaining two bonuses are for $50,000 and $100,000, and are governed by the following provision in the Addendum:

> Notwithstanding any other provisions of the Plan, JPI will pay incentives according to the following parameters for the first three years of employment:
>
> > i. $50,000.00 per each executed deal as approved by the Investment Committee, put through due diligence, and earned money put at risk.
> > ii. $100,000.00 per each deal with a completed purchase of land.

(*Id.*)

### b. Profit Sharing Program

Under the Contract, Plaintiff was entitled to participate in the Profit Participation Plan ("PPP"), which entitled Plaintiff to 2% of certain revenues for any project listed in an amended Exhibit B to the Contract.  (Def.'s 56.1 Stmt. ¶¶ 23-24.)  The Contract provided that projects would be added to "amended Exhibit B['s in the Company's sole discretion," and that Plaintiff "w[ould] have no interest in any future project until such project is added to an amended Exhibit B."  (Butz Aff. Ex. A, at J53.)  No project was ever added to any amended Exhibit B provided to Plaintiff.  (Def.'s 56.1 Stmt. ¶ 25.)

### 2. The Maritime Yards Project

In or about July 2006 (Plaintiff's first month of employment with Defendant), Plaintiff, through his contacts with Clay Fowler, introduced a viable transaction to Defendant known as the Maritime Yards Project.  (*Id.* ¶ 30.)  Fowler has testified that the Maritime Yards Project was an off-market transaction, which means that it was not being advertised and that offers were not being actively sought.  (Aff. of Paul T. Shoemaker in Supp. of Pl.'s Cross-Mot. for Summ. J. & in Opp'n to Def.'s Mot. for Summ. J. ("Shoemaker Aff.") Ex. 5, at 9-11.)  During the course of a friendly conversation, Fowler mentioned the project to Plaintiff.  (*Id.* Ex. 5, at 10.)  After Plaintiff brought the project to Defendant, Plaintiff and Fowler engaged in negotiations over

several months.  (*Id.* Ex. 5, at 13.)  These negotiations did not, during Plaintiff's employment,

result in any signed agreements.  (Def.'s 56.1 Stmt. ¶¶ 31-32.)  At or around when Plaintiff was

terminated, Plaintiff ceased to negotiate with Fowler and another JPI employee took over the

negotiations.  (Shoemaker Aff. Ex. 5, at 18-19.)  A letter of intent was signed on November 16,

2006.  (*Id.* Ex. 5, at 17-19.)  Defendant approved the deal on or about March 15, 2007, and the

purchase was completed on September 19, 2007.  (Def.'s 56.1 Stmt. ¶¶ 35-36.)  Fowler testified

that his negotiations with Plaintiff produced predecessor documents to the letter of intent that

was ultimately signed (Shoemaker Aff. Ex. 5, at 15-17), and that, though he had heard of

Defendant prior to these dealings, he would not have known of Defendant's interest in the

project and Defendant would not have been involved had it not been for Plaintiff, (*id.* Ex. 5, at

9).

### 3. Plaintiff's Termination

On November 13, 2006, Defendant sent a letter to Plaintiff entitled "RE: Agreement

Concerning Termination of Employment" (the "Termination Letter") offering Plaintiff, inter

alia, $35,828.31 "after receipt of a fully executed copy of this Severance Agreement."  (*Id.* Ex. 1

¶ 3.)  The Termination Letter also specified that Plaintiff would, among other things, "fully

release the [Defendant] and its Affiliates from any claims arising from your employment with

the [Defendant] or otherwise."  (*Id.* Ex. 1 ¶ 9.)  Plaintiff rejected this offer.  (Pl.'s 56.1 Stmt. ¶¶

2-3.)  Defendant's written severance policy states that employees who are employed for fewer

than six months are not entitled to severance, and that "[t]he severance pay policy is to be

administered according to the discretion of management and may be altered or discontinued at

any time without prior notice to Associates" (Butz Aff. Ex. D), but a November 13, 2006 internal

email (the "Nov. 13, 2006 Email") to Defendant's payroll department stated that Plaintiff was eligible for severance pay, (Shoemaker Aff. Ex. 7).

### B. Procedural Background

This case was removed from state court to this Court on December 5, 2007.  Defendant filed its Motion for Summary Judgment on May 1, 2009.  Plaintiff filed his Cross-Motion for Summary Judgment on May 4, 2009.  The Court held oral argument on February 11, 2010.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *see also Tufariello v. Long Island R.R.*, 458 F.3d 80, 85 (2d Cir. 2006) (noting that the court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  If the non-movant would bear the burden of proof at trial, it "is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial . . . ."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted); *see also Goenaga v. March of*

*Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.").

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). A fact is material when "it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be to "isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

### B. Interpretation of Contracts

#### 1. General Principles

Neither Party disputes that this case is subject to New York's substantive law of contracts. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 8-24 (repeatedly citing New York law); Pl.'s Mem. 12-21 (same)); *see also Postlewaite v. McGraw-Hill, Inc.* 411 F.3d 63, 67 (2d Cir. 2005) (applying New York law when the parties did not dispute that it applied). In New York, "a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."

*Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citing *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)).

"Under New York law, the initial interpretation of a contract is a matter of law for the court to decide.  Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law." *Kamfar v. New World Rest. Group, Inc.*, 347 F. Supp. 2d 38, 48-49 (S.D.N.Y. 2004) (internal citations and footnotes omitted); *see also RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) ("Where a 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'" (quoting *De Luca v. De Luca*, 751 N.Y.S.2d 766, 766 (App. Div. 2002))); *Terwilliger*, 206 F.3d at 245 ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument." (citing *Teitelbaum Holdings, Ltd. v. Gold*, 396 N.E.2d 1029, 1032 (N.Y. 1979))).  The mere fact that the Parties disagree on the proper interpretation of the contract does not render the contractual language ambiguous.  *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."); *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08-CV-4746, 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) ("'The language of a contract is not made ambiguous simply because the parties urge different interpretations.'" (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992))).

With respect to a contract claim, a court may grant summary judgment when the contractual language is "'plain and unambiguous.'"  *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 164 (2d Cir. 2005) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148-49

(2d Cir. 1993)).  "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"  *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (alteration in original) (quoting *Breed*, 385 N.E.2d at 1282).

### 2. Entitlement to a Bonus

In general, and like other contractual entitlements, entitlement to a bonus only exists where the terms of the relevant contract require it.  *See Ireton-Hewitt v. Champion Home Builders Co.*, 501 F. Supp. 2d 341, 353 (N.D.N.Y. 2007) ("An 'employee's entitlement to a bonus is governed by the terms of the employer's bonus plan.'" (quoting *Hall v. United Parcel Serv. of Am.*, 555 N.E.2d 273, 279 (N.Y. 1990))); *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 397 (S.D.N.Y. 2001) (same).  "However, this rule is limited by the 'long standing policy against the forfeiture of earned wages.'"  *Ireton-Hewitt*, 501 F. Supp. 2d at 353 (quoting *Weiner v. Diebold Group, Inc.*, 568 N.Y.S.2d 959, 961 (App. Div. 1991)); *see also Gruber v. J.W.E. Silk, Inc.*, 859 N.Y.S.2d 650, 651 (App. Div. 2008) (same).  Consistent with this rule (and its limitation), where the employee has already earned compensation under the terms of his employment contract, his termination does not affect his rights to that compensation, but where the employer retains discretion to award a bonus (or other compensation), no forfeiture of earned wages occurs if the bonus is not paid.  *See Weiner*, 568 N.Y.S.2d at 961 (distinguishing between "a 'bonus' payable at the discretion of the employer" and "post employment commissions . . . as to which the employer has no right to withhold," which, like "earned wages," are "not subject to forfeiture"); *Aquavella v. Viola*, No. 2002/06929, 2006 WL 323167, at *7 (N.Y. Sup. Ct. Sept. 25, 2006) (distinguishing between "a discretionary bonus or [compensation] otherwise payable

at the discretion of the employer" and "earned wages or salary subject to the longstanding policy against the forfeiture of normal wages" (internal quotation marks omitted)), *aff'd as modified*, 834 N.Y.S.2d 808 (App. Div. 2007); *Guggenheimer v. Berstein Litowitz Berger & Grossman LLP*, 810 N.Y.S.2d 880, 886 (Sup. Ct. 2006) (stating that "[w]hen a bonus [] is an integral part of a compensation package" and "has already been earned by the time the employer decides not to pay it," "failure to pay constitutes a breach of the employment agreement"); *Markby v. PaineWebber, Inc.*, 650 N.Y.S.2d 950, 954 (Sup. Ct. 1996) ("While earned wages are not subject to forfeiture, a 'bonus' is payable at the discretion of the employer, and thus is subject to forfeiture.").

If a contract is vague about the nature of the bonus, some courts have held that "[w]hether unpaid incentive compensation under a bonus plan constitutes a discretionary bonus or earned wages not subject to forfeiture is an issue of fact."  *Gruber*, 859 N.Y.S.2d at 651; *see also Mirchel v. RMJ Sec. Corp.*, 613 N.Y.S.2d 876, 878 (App. Div. 1994) (same); *Markby*, 650 N.Y.S.2d at 954 (same).  However, where an employee's contract either leaves the bonus in the employer's discretion or conditions it on an event that has not occurred, such as employment through a specific date, courts have decided such questions as a matter of law.  *See, e.g.*, *Kaul v. Hanover Direct, Inc.*, 296 F. Supp. 2d 506, 519 (S.D.N.Y. 2004) (holding that the plaintiff was not entitled to a bonus when the amount of the bonus was expressly tied to the amount remaining due on a debt that had already been satisfied), *aff'd by* 148 F. App'x 7 (2d Cir. 2005); *Welland v. Citigroup, Inc.*, No. 00-CV-738, 2003 WL 22973574, at *15 (S.D.N.Y. Dec. 17, 2003) (holding that the plaintiff was not entitled to a bonus where the bonus was conditioned on employment through a specific date and the plaintiff was not employed through that date), *aff'd by* 116 F. App'x 321 (2d Cir. 2004); *Criscuolo v. Joseph E. Seagram & Sons, Inc.*, No. 02-CV-1302, 2003

WL 22415753, at *10-11 (S.D.N.Y. Oct. 21, 2003) (holding that the plaintiff was not entitled to a bonus when the terms of the bonus stated "that employees who 'left voluntarily' would 'forfeit' the . . . bonus" and plaintiff voluntarily resigned (internal brackets omitted)).

> C. Plaintiff's Claims

> > 1. The $100,000 Employment Bonus

Plaintiff claims that the Addendum entitles him to a $100,000 employment bonus. As outlined above, both Parties agree that the only contractual language relevant to whether Defendant owes Plaintiff this bonus is contained in the Addendum, which provides:

> For the first three years of employment a minimum of $100,000.00 bonus will be paid as approved by the [Defendant] and the [Plaintiff] must be employed by the [Defendant]. The above stated bonus is not a draw and will not be netted with future Profit Participation payments. After thirty-six months of employment, the terms of the [PPP] only is [sic] in effect.

(Butz Aff. Ex. A, at J68.) Defendant initially contended that because Plaintiff was not employed for a full year, he was not entitled to the employment bonus, and, in the alternative, that payment of the bonus was subject to Defendant's discretion. (Def.'s Mem. 10, 12.) Plaintiff disagrees with Defendant's first argument and, as to the second argument, argues that even if Defendant retained some discretion over Plaintiff's bonus, Defendant was forbidden, under the covenant of good faith and fair dealing, from exercising its discretion in an "arbitrary and capricious" manner. (Pl.'s Mem. 15-20.)

Under the Contract, the $100,000 employment bonus was discretionary. Therefore, it follows that the bonus was not earned wages, and that Plaintiff's invocation of New York's policy "against the forfeiture of earned wages" (Pl.'s Mem. 18), is unhelpful. *See Weiner*, 568 N.Y.S.2d at 961 (distinguishing discretionary bonuses from earned wages); *Aquavella*, 2006 WL 3232167, at *7 (same); *Markby*, 650 N.Y.S.2d at 954 (same). Furthermore, the fact that the

employment bonus was discretionary would make irrelevant the Parties' dispute about the interpretation of the phrase "must be employed by."  Even if the Plaintiff's interpretation were correct, and the phrase did not require employment at year's end, it would not follow that Plaintiff was entitled to the bonus.  However, at oral argument, Defendant's counsel all but abandoned the claim that the bonus was discretionary and suggested that if Plaintiff had been employed to the year's end, the bonus would constitute earned wages.  (Tr. of Oral Argument ("Tr.") 54.)[2]

Therefore, the Court must address whether there is a legally identifiable meaning of the phrase "the Participant must be employed by the Company."  (Butz Aff. Ex. A, at J68.)  The Court holds that there is not.  Plaintiff's argument that the phrase merely requires employment at some point in the year would make it surplusage, as all of its content is contained within the phrase, "[f]or the first three years of employment."  (*Id.*)  However, Defendant's argument that employment was required until year's end finds no textual support.  Put bluntly, neither the Contract nor the Addendum state the precise time by which Plaintiff must be employed to receive the bonus.  For example, there is no explicit requirement that Plaintiff be employed *at the end of each year*, only a requirement that Plaintiff "must be employed by the [Defendant]."

---

[2]Elsewhere during oral argument, while Counsel suggested that the $100,000 bonus was payable in JPI's discretion, he conceded that such discretion was limited by the "[i]mplied duty of good faith and fair dealing."  (Tr. 50.)  Here, Plaintiff alleges that Defendant breached the duty of good faith because the Parties intended this bonus as an employment bonus and Plaintiff was not terminated for cause.  (Pl.'s Mem. 16-17.)  Because the Court holds that whether the bonus was contingent on employment at year's end is a jury question, if the jury finds for Plaintiff on that point, it could also find that withholding the bonus when Plaintiff was fired by the Defendant for "cultural reasons" was a breach of the implied duty of good faith.  Thus, even if the bonus is discretionary, summary judgment must be denied as, assuming the bonus was not contingent on employment through year's end, a material dispute of fact exists as to whether the Defendant exercised its discretion to deny Plaintiff the bonus in good faith.

(*Id.*)  There is no guidance in the text of the Contract or Addendum as to which interpretation is correct.  Finally, there is a material dispute of fact as to what the extrinsic evidence demonstrates regarding the Parties' intent.  Defendant initially suggested that the Contract would "guarantee a $100,000.00 bonus for first [sic] two years of employment."  (Butz. Aff. Ex. B, at 3.)  Plaintiff asked for a third year, and Defendant agreed, though Defendant added the language making the bonus discretionary and requiring Plaintiff's employment with Defendant.  (Def.'s 56.1 Stmt. ¶ 14; Butz Aff. ¶ 4.)  Nothing in this exchange is conclusive as to the intent of the Parties, or the meaning of the final document.  "Ambiguity exists when a contract is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'"  *Zurich Am. Ins. Co.*, 397 F.3d at 164-65 (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)).  Therefore, both the motion and cross-motion seeking summary judgment are denied as to this claim.

### 2. The $100,000 and $50,000 Deal Bonuses

Plaintiff claims that he is entitled to two bonuses from the Maritime Yards Project: a $50,000 deal bonus, and a $100,000 deal with purchase of land bonus.  Both Parties agree that the key contractual language is, once again, contained in the Addendum, which provides:

> Notwithstanding any other provisions of the Plan, JPI will pay incentives according to the following parameters for the first three years of employment:
>
> > i. $50,000.00 per each executed deal as approved by the Investment Committee, put through due diligence, and earned money put at risk.
> > ii. $100,000.00 per each deal with a completed purchase of land.

(Butz Aff. Ex. A, at J68.)  Defendant concedes that these bonuses were not discretionary and that

if the conditions described in the Addendum were met, then the bonuses had to be paid.  (Def.'s

Mem. 14 (describing the conditions required for Plaintiff to be entitled to the bonuses).)

Defendant argues, however, that these conditions had to be met while Plaintiff was still

employed by Defendant.  (*Id.* at 18.)  Therefore, according to Defendant, because these

conditions were ultimately met only after Plaintiff's termination, he is not entitled to the two

bonuses.

      To support its argument that Plaintiff "was required to complete these targets during the

time he was employed at JPI in order to be eligible for the incentive payments," Defendant

primarily relies not on the Contract, but on two cases: *Anderson v. Sotheby's, Inc.*, No. 04-CV-

8180, 2006 WL 1722576 (S.D.N.Y. June 22, 2006) and *Grey v. Federal Deposit Insurance

Corp.*, No. 88-CV-7452, 1998 WL 483460 (S.D.N.Y. Aug. 14, 1998).  (Pl.'s Mem. 14-19.)  In

*Anderson*, the court "f[ound] that [plaintiff]'s continuing employment [with the defendant] was

an implied condition precedent to receiving a bonus."  *Anderson*, 2006 WL 1722576, at *20.

Though the court in that case did not quote from the relevant contractual language, the decision

was based on the fact that the bonus was a manager's bonus based on the profits of the managed

region and that the plaintiff sought the annual bonus based on managing the region from

"January 1, 2004 through February 17, 2004."  *Id.* at *3-4, *20.  Moreover, the court found that

the plaintiff's "bonus would vest sometime after year-end so long as he remained employed."

*Id.* at *20.  In making that determination, the Court relied on the past practice of the parties.  *Id.*

In this case, there is no past practice to guide the Court.

      In *Grey*, the court was confronted with contractual language requiring that "consideration

[be] 'actually received . . . during [plaintiff's] initial nine month employment term.'"  *Grey*,

1998 WL 48360, at *13 (quoting the relevant contractual language) (omission and second alteration in the original).  Unsurprisingly, the court in that case found that the plaintiff was only entitled to bonuses when the consideration was received during plaintiff's employment and not "for transactions closed months after [plaintiff's] employment ended."  *Id.* at *14.

Here, Defendant contends that "[t]he words used in the Addendum, such as 'put through' and 'completed,' [are] similar to [the] word 'actual' used in the contract in *Grey*, are clear and demonstrate that those events were to occur during the time [Plaintiff] was employed."  (Def.'s Mem. 16.)  Defendant's argument is unpersuasive.  The phrase "actually received during plaintiff's initial nine month employment term," is clear contractual language.  *See Grey*, 1998 WL 483460, at *13 (alteration, quotation marks, and ellipse omitted).  The contract in this case has no such language.  Key to the difference between *Grey* and this case is not the use of the word "actual," as Defendant contends, but the use of an explicit time frame.  If the bonuses were explicitly contingent on deals being "put through" or "completed" during the Plaintiff's employment, then *Grey* would be a highly relevant case.  They were not, and it is not.

Thus, instead of these cases, the Court's analysis properly focuses on the language of the Contract and Addendum, the latter of which, by its own terms, modifies the Contract.  (Butz Aff. Ex. A, at J68.); *see Rensselaer Polytechnic Inst. v. Varian, Inc.*, No. 07-CV-5155, 2009 WL 2462297, at *1 (2d Cir. Aug. 12, 2009) (summary order) (noting that rather than turning to extrinsic evidence, the Court should read the Contract "as a whole" and interpret each part "with reference to the whole" so "as to give effect to its general purpose"); *Adams v. Suozzi*, 433 F.3d 220, 228 (2d Cir. 2005) (same); *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003) (same).  The Contract generally outlines two types of "incentive compensation:" "Adjusted Cash Flow" and "Adjusted Project Cash Flow."  (Butz Aff. Ex. A, at J52.)  Adjusted

14

Cash Flow is calculated with reference to the profits accrued by Defendant within a "Designated Geographic Area."  (*Id.* Ex. A, at J62.)  "Adjusted Project Cash Flow" is "calculated on a project-by-project basis," and "includes both revenues and expenses from the ownership and operation of" qualifying projects.  (*Id.* Ex. A, at J65.)  Though the term "executed deal" does not appear in the description of either "Adjusted Cash Flow" or "Adjusted Project Cash Flow," the deal bonuses are clearly calculated on a "project-by-project basis" and not based on a "[d]esignated [g]eographic [a]rea."  It follows that the most natural reading of the bonuses granted to Plaintiff is as guaranteed minimum payments meant to supplement the "Adjusted Project Cashflow" and "Adjusted Cashflow" compensation categories.  It is undisputed that the purpose of these deal bonuses was "to compensate Vetromile for the period of start up . . ., whe[n] his compensation would not have been as high as a senior executive's salary in general." (Def.'s 56.1 Stmt. ¶ 29.)  It is also plausible that the $100,000 employment bonus was intended to serve as a minimum payment for the "Adjusted Cash Flow" compensation category.  Thus, the Addendum provided two categories of minimum payments designed to supplement the two categories of compensation in the Contract that would eventually provide Plaintiff's income once he had built up his, and the Defendant's, portfolio.

Plaintiff contends that the Contract and Addendum only required him to "be a participant" in the relevant transactions, but not to be employed through the period in which the various triggering conditions were met.  (Pl.'s Mem. 14; Pl.'s Reply 5-6.)  The "participant" language may be drawn from the Contract's description of the "Adjusted Project Cash Flow" compensation category, which extends compensation for "projects in which [Plaintiff was] a participant during [his] employment with the [Defendant]."  (Butz Aff. Ex. A, at J52.)  Indeed, other provisions used to define Adjusted Project Cash Flow repeatedly talk of participation.  (*Id.*

Ex. A, at J53 (defining "Real Estate Participation Amounts" and "Real Estate Participation Percentage").)  Defendant, in its response, provides further support for reading the deal bonuses as addenda to the Adjusted Project Cash Flow compensation scheme and for using "participation" as the metric for determining whether Plaintiff is entitled to claim the bonuses. (Def.'s Reply Mem. of Law in Further Supp. of Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Reply") 9-10 (arguing that whether or not Plaintiff originated the deal in question is irrelevant and stating that Plaintiff would have earned the bonus if he "worked on a transaction" that met the various criteria during Plaintiff's term of employment).)  It is also undisputed that Plaintiff was not required to originate the deal in order to be eligible for these deal bonuses.  (Def.'s 56.1 Stmt. ¶ 29.)

        One natural conclusion from all of this, is that Plaintiff was entitled to the deal bonuses when he participated in the relevant deal.  However, while it is clear that Plaintiff's participation in the deal was necessary for Plaintiff to be entitled to the bonuses, it is not beyond dispute that participation would have been sufficient.  For example, had the Plaintiff merely photocopied a document or two, or participated in some other trivial manner, it is not clear that he would have been entitled to the bonuses.  Plaintiff's counsel conceded at oral argument that it might be reasonable to read in a "materiality" requirement to the Contract.  Based on this criteria, Plaintiff has an argument that his participation was material as he originated the deal and provided the foundation for the ultimately successful negotiations.

        However, on a motion for summary judgment, it is not the Court's role to establish the most natural reading of the Contract and Addendum.  Rather, in order to grant summary judgment, the Court must establish that "there is no reasonable basis for a difference of opinion."

*Hunt Ltd.*, 889 F.2d at 1277 (internal quotation omitted). Several considerations suggest that even if Plaintiff's reading might be plausible, it is not the only reasonable reading.

First, though the Addendum creates two categories of minimum compensation which parallel the kinds of compensation outlined in the Contract, there is no reference in the Addendum, either implicit or explicit, to the compensation categories in the Contract. Specifically, there is nothing in the Addendum itself which ties the $100,000 and $50,000 deal bonuses to the far more detailed explanation of "Adjusted Project Cash Flow" contained in the Contract. Second, even if the Addendum was intended to provide minimum payments to the compensation categories in the Contract, there is nothing in the language of the Addendum or the Contract which ties the requirements for compensation under the Contract to the requirements for compensation under the Addendum. In sum, there is nothing that directly links any language in the Contract to any language in the Addendum, and the language of the Addendum is silent as to whether Plaintiff needed to be employed when the various triggering conditions were met.

Third, even if these considerations are not enough to make Defendant's interpretation of the Addendum reasonable, Defendant could accept that the Addendum provided for minimum payments for the compensation categories created by the Contract, and that "participation" is an appropriate measurement established by the Contract, and still argue that Plaintiff had to be employed through the triggering conditions. Even Plaintiff's counsel conceded that a materiality requirement might need to be read into the "participation" language because the Contract (which discusses participation) establishes a discretionary compensation scheme, whereas the Addendum establishes a mandatory compensation scheme. Defendant could argue that the materiality requirement was defined by the Addendum – i.e. that only a project that met the

triggering conditions during Plaintiff's employment would satisfy materiality.  Of course, that would involve conceding that if Plaintiff had photocopied two documents, and thus participated in a deal, he would be entitled to the deal bonuses if he were employed through the triggering conditions.

Taking these considerations together, the Court cannot say that the Plaintiff's reading is, as a matter of law, the only reasonable interpretation of the Contract and Addendum.  The Court will, therefore, consider Defendant's extrinsic evidence.  Defendant seeks to support its argument that Plaintiff was required to remain employed through the time that the conditions were satisfied with an affidavit from Jim Butz, Defendant's Eastern Division "President and Managing Partner."  (Butz Aff. ¶ 1; Def.'s Mem. 17.)  Butz attests that "JPI does not pay its employees broker's fees or finder's fees."  (Butz Aff. ¶ 7.)  In general that may well be true, but it is not dispositive here.  Defendant's general policy does not defeat the natural reading of the Contract, especially considering that the Addendum is specifically intended to conform the general corporate policy to Plaintiff's situation.  (*Id.* ¶ 3 (acknowledging that the PPP was not an appropriate compensation system for Plaintiff in the early years of Plaintiff's employment with Defendant and stating that "[t]hus, other incentive compensation provisions were negotiated"); Def.'s 56.1 Stmt. ¶ 29.)  The Butz Affidavit, therefore, does not clarify the Contract or the Addendum.

A material dispute of fact exists concerning whether the Parties intended Plaintiff to have to remain employed when the deal bonuses' milestones, as outlined in the Addendum, were reached.  Accordingly, both summary judgment motions are denied as to these claims.

### 3. Maritime Yards Project Profit Sharing

In his Complaint, Plaintiff asserted an entitlement to $1,050,000 as payments due under the PPP.  (Compl. ¶ 16.)  Defendant has moved for summary judgment on this point.  (Def.'s Mem. 19.)  Plaintiff never responded to Defendant's arguments, nor made arguments of his own on this issue despite filing a Cross-Motion for Summary Judgement and a reply memorandum.  However, at oral argument, Plaintiff's counsel argued that Defendant could not deny Plaintiff these payments in bad faith.

Defendant makes two arguments which it believes demonstrates that Plaintiff is not entitled to PPP payments.  First, Defendant argues that PPP payments are only made on projects which are in an "Exhibit B" to the Contract and that the Maritime Yards Project was never attached to Plaintiff's Exhibit B.  (*Id.* at 19-20.)  Second, Defendant argues that, under the Contract, it had "sole discretion" to add projects to Exhibit B.  (*Id.* at 21.)  If both of Defendant's arguments are correct, then the PPP payments would not be earned wages (which are not subject to forfeiture), but would be discretionary payments that had not vested when Plaintiff's employment was terminated.

The Contract makes explicit that Plaintiff "will have no interest in any future project until such project is added to an amended Exhibit B to this agreement," and that the only eligible projects are ones "which ha[ve] been acquired[,] or on which construction has commenced . . . as of the date" of the amended Exhibit B.  (Butz Aff. Ex. A, at J53.)  At his deposition, Plaintiff was asked if the agreement he signed had any projects listed on Exhibit B and whether he had ever received an amended Exhibit B.  (Sparber Aff. Ex. F, at 85-86.)  Plaintiff answered both questions in the negative.  (*Id.*)  Plaintiff, therefore, has no evidence suggesting that the Maritime Yards Project was ever attached to a relevant Exhibit B.  Moreover, no such evidence is readily

apparent in the record.  Indeed, the relevant contractual language is quite explicit in stating that "projects[] will be added to an amended Exhibit B in the [Defendant]'s sole discretion."  (Butz Aff. Ex. A, at J53.)

Plaintiff is correct that discretionary decisions regarding contractual rights must be made in good faith.  *See Travellers Int'l A.G. v. Trans World Airline, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) ("Under New York law, the implied covenant of good faith and fair dealing inheres in every contract."); *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 261 F.R.D. 4, 9 (W.D.N.Y. 2009) ("Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." (internal quotation marks omitted)).  However, the covenant of good faith "cannot be used to impose 'obligations that were not explicitly part of the agreement.'"  *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 324 (S.D.N.Y. 2009) (quoting *Ari & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003)).  "To state a cause of action for breach of the implied covenant of good faith and fair dealing, 'the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff.'"  *Dweck Law Firm, L.L.P. v. Mann*, 340 F. Supp. 2d 353, 358 (S.D.N.Y. 2004) (quoting *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128, 130 (App. Div. 1999)); *see also Schroeder v. Capital One Fin. Corp.*, 665 F. Supp. 2d 219, 225 (E.D.N.Y. 2009) (noting that the covenant of good faith is breached "when one party acts to deprive the other of the right to receive the benefits under the agreement").

Plaintiff has not demonstrated bad faith.  Plaintiff was an at-will employee, and so could be fired at any time, for any reason.  *See Arbeeny v. Kennedy Executive Search, Inc.*, 893 N.Y.S.2d 39, 44 (App. Div. 2010) ("The implied covenant of good faith does not give rise to a

contract action for the wrongful discharge of an at-will employee." (internal citation omitted));

*Trakis v. Manhattanville Coll.*, 859 N.Y.S.2d 453, 455 (App. Div. 2008) ("Where employment is

at will, an employee may be terminated at any time, for any reason, or no reason at all.  There is

no requirement that the employee be discharged in good faith . . . ." (internal citations omitted)).

Therefore, Plaintiff must demonstrate that the Defendant acted in bad faith at the time it made

the decision not to give Plaintiff an amended Exhibit B, a decision that could not have been

made, with respect to the Maritime Yards Project (or any other project), until that deal had

closed.  (Butz Aff. Ex. A, at J53 (requiring a project to "ha[ve] been acquired" before it could be

added to an amended Exhibit B).)  However, Plaintiff was no longer employed by Defendant at

that time and, so, Defendant's actions were indisputably rational and reasonable.  Given the clear

and unambiguous contractual language, and the lack of a showing of bad faith, Plaintiff is not

entitled to PPP payments for the Maritime Yards Project, and Defendant's Motion for Summary

Judgement on this claim is granted.

### 4. Severance Benefits

Plaintiff alleges a breach of contract claim for severance benefits.  (Compl. ¶¶ 19-20.)

Defendant's severance policy states that "[s]everance pay is pay given at the discretion of the

[Defendant]" "based on the[] length of service in accordance with" a schedule that states that

employees whose length of service is under six months will receive no severance pay.  (Butz

Aff. Ex. D.)  The policy also states that the "severance pay policy is to be administered

according to the discretion of management and may be altered or discontinued at any time

without prior notice to Associates."  (*Id.*)  Plaintiff points to no contractual terms that would

entitle him to severance pay.  Indeed, neither the Contract nor the Addendum mention severance

pay.  Instead, Plaintiff relies on the Termination Letter (which Plaintiff rejected), and the

November 13, 2006 Email.  (Pl.'s Mem. 20-21; Shoemaker Aff. Ex. 1; *id.* Ex. 7.)

      New York recognizes a breach of contract claim for an at-will employee who did not

receive severance pay when that employee presents evidence of "'(1) a regular practice by

defendant to make severance payments, and (2) [plaintiff's] reliance on that practice in accepting

or continuing his employment.'"  *Baguer v. Spanish Broad. Sys., Inc.*, No. 04-CV-8393, 2007

WL 2780390, at *6 (S.D.N.Y. Sept. 20, 2007) (quoting *Smith v. N.Y. State Elec. & Gas Corp.*,

584 N.Y.S.2d 117, 118 (App. Div. 1989)).  In this case, Plaintiff presents insufficient evidence

establishing Defendant's regular severance practice, and offers no evidence whatsoever

concerning reliance (Pl.'s Mem. 20-21; Pl.'s Reply 6-7), thus dooming his severance claim.  S*ee*

*Hirschfeld v. Institutional Investor, Inc.*, 688 N.Y.S.2d 32, 32 (App. Div. 1999) (dismissing a

claim for severance payments for lack of evidence of detrimental reliance); *Gallagher v. Ashland*

*Oil, Inc.*, 583 N.Y.S.2d 624, 625-26 (App. Div. 1992) (stating that the standard was "a showing

of a regular practice by the employer to provide the benefits now claimed, the employee's

knowledge of the practice and his or her reliance upon such practice as evidenced by accepting

or continuing employment as a result thereof," and dismissing the claim for severance benefits

because "the record [was] bereft of evidence that plaintiff *relied* upon the availability of

severance pay in accepting or continuing his employment" (emphasis in original)).  In fact,

Plaintiff essentially acknowledges that he has no claim for severance under New York contract

law by making no arguments under New York contract law.  (Pl.'s Mem. 20-21; Pl.'s Reply 6-

7.)

Instead, in his summary judgment papers, Plaintiff metamorphoses his claim into one arising under ERISA.[3]  (Pl.'s Mem. 20-21; Pl.'s Reply 6-7 (complaining that "JPI does not deal with the ERISA basis for [Plaintiff]'s claim").)  That will not do.  A party may not automatically raise a claim at summary judgment that he did not plead.  *See* Fed. R. Civ. P. 56(a) (stating that "[a] party claiming relief may move . . . for summary judgment on all or part *of the claim*" (emphasis added)); Fed. R. Civ. P. 8(a)(1) (stating that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); *Richards v. Conn. Dep't of Corr.*, 349 F. Supp. 2d 278, 291 (D. Conn. 2004) (refusing to consider a claim made for the first time in opposition papers to a motion for summary judgment even though the underlying facts of the claim were pled in the plaintiff's complaint).  Though the Court has discretion to adjudicate a claim that was not pled, the Court declines to exercise its discretion in Plaintiff's favor due to the utter lack of notice to Defendant and the accompanying prejudice to Defendant.  *See Richards*, 349 F. Supp. 2d at 291 (finding prejudice where the failure to plead a claim had "deprived defendants of the notice necessary to permit them to conduct discovery and prepare a defense").  Defendant's Motion for Summary Judgment on this claim, therefore, is granted.[4]

---

[3]If Plaintiff maintains that ERISA governs his severance benefits, then he was required to abandon his state law claims, as they would be pre-empted.  *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004) (noting that "any state-law cause of action that duplicates, supplements or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted").

[4]Though the Court need not address Plaintiff's ERISA claim, the Court will make a few observations.  Plaintiff has two potential arguments that he is entitled to severance under ERISA. The first is that Defendant's offer to pay severance in the Termination Letter constituted an admission by Defendant that it owed Plaintiff severance.  The second is that the Termination Letter, together with the November 13, 2006 Email, constitute evidence of Defendant's informal policy or practice under which Plaintiff is entitled to severance.  Without rehearsing the full complexity of ERISA law, the Court notes that Plaintiff's first argument fails because statements made "in compromise negotiations" are "not admissible . . . when offered to prove liability . . . ."

5. Quantum Meruit and Unjust Enrichment

Defendant moves for summary judgment on Plaintiff's second and third causes of action for quantum meruit and unjust enrichment.  (Def.'s Mem. 21.)  Plaintiff responds by acknowledging that "[t]hose claims are irrelevant at this point because JPI does not deny the contract," but asks that the claims be held in abeyance because they "would . . . be valid if and to the extent that the contract did not apply."  (Pl.'s Mem. 21.)  Defendant interprets this as a concession that the claims have no legal basis.  (Def.'s Reply 15.)  Plaintiff does not respond (*see generally* Pl.'s Reply), for good reason as a "plaintiff may only assert a claim of quantum meruit in the absence of an agreement between the parties, be it oral, written or implied-in-fact." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 n.10 (2d Cir. 2009); *see also Kramer v. Lockwood Pension Servs., Inc.*, 653 F. Supp. 2d 354, 382 (S.D.N.Y. 2009) (stating that under New York law, "recovery for unjust enrichment is barred by a valid and enforceable contract").  Given that the Court has held that the Contract and Addendum do cover these claims (even if summary

Fed. R. Evid. 408(a), (a)(2).  At oral argument, Plaintiff's counsel argued that this rule was inapposite, but if an offer to pay monies Plaintiff believed were due to him in exchange for a release from all legal claims is not a statement made during "compromise negotiations," then the Court is not sure that anything would be.  *See Alpex Computer Corp. v. Nintendo Co.*, 770 F. Supp. 161, 163 (S.D.N.Y. 1991) ("All that is needed for Rule 408 to apply is an actual dispute, or at least an apparent difference of opinion between the parties as to the validity of a claim."). Plaintiff's second argument could not rely on Defendant's written severance policy, because under the written policy Plaintiff is not entitled to severance (because he was employed for fewer than six months).  *See Giordano v. Thomson*, 438 F. Supp. 2d 35, 43-44 (E.D.N.Y. 2005) (stating that to establish a claim under ERISA § 502(a)(1)(B), 29 U.S. § 1132(a)(1)(B), "a plaintiff must . . . demonstrate that defendant has failed to comply with the terms of the plan" (internal citations omitted)).  Therefore, Plaintiff would have to establish Defendant's "past practice of awarding severance" to employees in Plaintiff's position (in violation of its written policy).  *See id.* at 41; *see also Bennett v. Gill & Duffus Chems., Inc.*, No. 85-CV-4119, 1987 WL 34256, at *3-4 (S.D.N.Y. Dec. 29, 1987) (finding that an informal ERISA plan existed based on the past practice of the employer).  Yet, Plaintiff has offered no evidence that establishes any of Defendant's past actions towards other employees in Plaintiff's situation and, therefore, has not established that a material dispute of fact exists concerning Defendant's past severance practice.

judgment cannot be granted on all of them), there is no future event which justifies holding these claims in abeyance. Therefore, the Court grants Defendant's Motion for Summary Judgment as to these claims.

### III. Conclusion

For the reasons given herein, Defendant's Motion for Summary Judgment is granted in part and denied in part, and Plaintiff's Cross-Motion for Summary Judgement is denied. The Clerk of the Court is respectfully requested to terminate the relevant motions (Dkt. Nos. 20, 30).

SO ORDERED.

Dated:      March 30, 2010
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List (By ECF):

Paul T. Shoemaker, Esq.
Greenfield, Stein & Senior, L.L.P.
600 Third Avenue,
New York, NY 10016
pshoemaker@gss-law.com

Neil G. Sparber, Esq.
Fulbright & Jaworski, L.L.P.
666 Fifth Avenue,
New York, NY 1013
nsparber@fulbright.com